# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-899


**STATE OF LOUISIANA**

**VERSUS**

**WILLIE LEE PRICE, JR.**

**-AKA- WILLIE PRICE**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2013-CR-176957
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Marc T. Amy, Billy Howard Ezell, and Shannon J. Gremillion, Judges.


**CONVICTION AND SENTENCE AFFIRMED.**

**Charles A. Riddle, III**
**District Attorney, Twelfth Judicial District Court**
**417 N. Main St.**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Willie Lee Price, Jr.**

**Willie Price**
     **Willie Lee Price, Jr.**

**GREMILLION, Judge.**

On November 14, 2013, Defendant, Willie Lee Price, Jr., a.k.a. Willie Price, along with codefendants Asa Bentley, Donnie Edwards, Chadwick McGhee, and Tamika Williams, were charged by bill of indictment with the second degree kidnapping of Jessica Guillot, in violation of La.R.S. 14:44.1.[1] On March 11, 2015, following a two-day trial, a unanimous jury found Defendant guilty as charged.

On April 12, 2016, Defendant was granted an out-of-time appeal and appointed appellate counsel. On August 4, 2016, Defendant was once again granted an out-of-time appeal. He now seeks review of his conviction and sentence, alleging three assignments of error.[2]

## FACTS

The victim, Jessica Guillot, went missing from Simmesport, Louisiana in September 2013 and has not been seen since. Laura Stelly, the victim's mother, testified that she last saw her daughter on September 6, 2013, around 8:00 p.m. She testified that, when she saw her daughter, nothing seemed out of the ordinary. Stelly noted that her daughter had run off for an extended period once before.

---

[1] We have previously overturned Chadwick McGhee's conviction and sentence for the lesser-included offense of simple kidnapping, as well as affirmed Asa Bentley's conviction for second degree kidnapping, but remanded for resentencing. *See State v. McGhee*, 15-285 (La.App. 3 Cir. 11/4/15), 179 So.3d 739, *writ granted*, 15-2140 (La. 1/13/17), ___ So.3d ___, and 15-286 (La.App. 3 Cir. 11/4/15), 178 So.3d 316, *writ granted*, 15-2141 (La. 1/13/17), __ So.3d __; *State v. Bentley*, 15-597 (La.App. 3 Cir. 1/6/16), 182 So.3d 1269, and 15-598 (La.App. 3 Cir. 2/3/16), 185 So.3d 254.

[2] We have conducted an error patent review and found there are no errors patent.

Cecil Cooper, the victim's fiancé, testified that the last time he saw her was September 6, 2013.[3] The remainder of Cooper's testimony on direct examination related to a ride home he received from Bentley and McGhee on September 7, 2013. Cooper testified on cross-examination that he had never seen the victim and Defendant together.

James Crystal, Jr., testified that he knew the victim, Bentley, and Defendant, and that Defendant and Bentley are brothers. The remainder of Crystal's testimony concerned an incident wherein he alerted Bentley to the presence of the victim near his home. However, Crystal specifically noted that Defendant had "no part" in any of the events about which Crystal testified.

Tomika Mason, Bentley's girlfriend in September 2013, testified that Defendant and Bentley were brothers and that Defendant would occasionally stay at her and Bentley's residence. She testified that Bentley sold drugs for a living. She also testified that, on September 10, 2013, she found out that her Dodge Durango had been damaged, and that Bentley had driven it the night before. She testified that Bentley had come home around midnight, and that the next morning her son informed her that the truck had been damaged. Mason testified that they thought the truck had been vandalized, since there was paint on the outside of the truck, the seats had been dyed blue inside, the back window was shattered, and three of the tires were flat.

Mason testified that Bentley told her that on September 9, 2013, he had been with his cousin, Chase, and Crystal. Mason said that Bentley did not mention being with Defendant, nor did Mason see Defendant that day.

---

[3]Cooper actually testified that the last time he saw Jessica was September 7, 2013, but he then testified that they were watching movies on September 6, that he went to bed around 9:30 p.m., and that Jessica was gone when he woke up the next morning.

Tamika Williams, a codefendant in this case, testified to the details of her plea agreement; namely, that in exchange for truthful testimony against her codefendants, she would be allowed to plead guilty to obstruction of justice, receive a ten-year hard-labor sentence, and that upon the completion of the last codefendant's trial or plea, the district attorney's office would move to have her sentence reduced to time-served and she would be released. She then testified that she has previously been a drug addict who had problems with pills and cocaine, and that she knew Bentley because she had sex with him and purchased drugs from him.

Williams testified about seeing Bentley chase the victim "[i]n Simmesport on the back roads by the church," but stated Bentley failed to catch the victim. She also stated Bentley was looking for the victim because he claimed the victim stole cocaine and money from him. Williams described later going for a ride with Bentley from Simmesport towards Mansura on Louisiana Highway 1. She stated that while she and Bentley were riding around, Defendant called Bentley and told him to meet Defendant in Mansura. Williams also stated that she heard Defendant ask Bentley why Williams was with him and tell him that she was not supposed to be there. She testified that they travelled to the "Y Not Stop" on Highway 1 in Mansura, where they met a small silver car on the side of the road.

Williams testified that she heard the victim yelling at Bentley to "stop pulling on [her], let [her] go." She testified that she saw Defendant get out of the driver's seat of the car and push the victim, but then Defendant stopped. Williams testified that Donnie Edwards then got out of the silver car and got in the driver's seat of the Durango she and Bentley had originally been driving, and that Bentley shoved the victim into the back of the Durango and got on top of her. Williams

3

said that the silver car then made a U-turn and headed back towards Simmesport with the Durango following.

Williams testified that she saw what appeared to be Bentley choking the victim in the back of the Durango and heard what sounded like someone "slapping or hitting her," but claimed that she never turned around completely, so she did not know for sure what was happening. She stated that after a few minutes, she heard what sounded like glass breaking, then smelled a funny smell "[l]ike when somebody go [sic] to the bathroom on they [sic] self." Williams testified that she was scared and texted her sister during the ride back to Simmesport, at the end of which Edwards and Bentley dropped her off at her apartment. She further stated that as soon as she was dropped off, she grabbed her baby and went to her mother's house, which was around eight minutes away. Shortly thereafter, the Durango showed up at her mother's house, and Bentley, Edwards, Chadwick McGhee, and Defendant got out of the vehicle. She stated that Defendant complained she was not supposed to be there, and that she subsequently began to see Defendant every day.

Williams' first call to police, in which she pretended to be her children's babysitter, Bonita Robinson, was played to the jurors, and Williams testified that she pretended to be Robinson because she was scared. She acknowledged that she spoke to the police multiple times before she ever admitted that she was in the Dodge Durango, or gave the testimony she presented at trial.

On cross-examination, Williams acknowledged that, during a prior trial, she never mentioned Defendant being "involved with placing [the victim] in the back of th[e Durango.]" She also acknowledged that, while in prison, she sent a letter to Bentley in which she claimed she had not told the police anything because "how

4

can [she] say anything about what happen[ed] if [she] wasn't there and don't [sic] know what happened."

Detective Jeremiah Honea, a twelve-year veteran of the Avoyelles Parish Sheriff's Office (APSO) with over six years of experience as a detective, testified that he was the lead detective in the case once the APSO took over the case from the Simmesport Police Department. Detective Honea testified that the Durango was sent off for testing by the state police, and the results indicated that "there were no readable finger prints inside the vehicle and they did not locate any DNA evidence inside the vehicle." He also testified that the victim's phone was active on September 7, 2013, it did not leave the Simmesport area, and has been inactive since that date.

After defense counsel pointed out that Williams' story of what happened on September 9, 2013, is not supported by her cell-phone records, Detective Honea acknowledged that "we don't have a solid exact time frame of what date it was," and that he could not "say for certain that [the] 9th was the night that she was, that [the victim] was taken, that she was kidnapped."

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Defendant argues that the evidence presented at trial was insufficient to support his conviction for second degree kidnapping, in violation of La.R.S. 14:44.1, under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). Second degree kidnapping is relevantly defined as kidnapping someone wherein the victim is physically injured or sexually abused. La.R.S. 14:44.1(A)(3). Kidnapping is defined under La.R.S. 14:44.1(B) as:

5

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

The analysis for an insufficient evidence claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

While Defendant contends that this court should vacate his conviction as it did in the case of his codefendant, McGhee, or at least reduce his conviction to simple kidnapping, we disagree. In the case of Chadwick McGhee, this court noted that "[a]t most, the State proved that [McGhee] was present when the victim was kidnapped and failed to stop the kidnapping or report it to authorities, so-called misprision of a felony. However, while misprision may be unsavory, it ceased to be a crime in Louisiana after 1942." *McGhee*, 179 So.3d at 747. In *McGhee*, the most damning testimony against him was that he was in the car crying while the others turned the victim over to Bentley, and McGhee was subsequently threatened by Bentley.

6

Conversely, the evidence in the present case, when viewed in the light most favorable to the prosecution, shows that Williams testified that Defendant contacted his brother, Bentley, and arranged for Bentley to meet him in Mansura. Upon arriving for said meeting, Defendant had the victim in his vehicle. Furthermore, Williams testified that Defendant actually physically pushed the victim while Bentley was pulling her towards the Durango, which in and of itself satisfies the "forcible seizing and carrying of any person from one place to another" requirement of second degree kidnapping. La.R.S. 14:44.1(B)(1). Finally, Williams' testimony reveals that Bentley then proceeded to, at the very least, choke and beat on the victim, thereby satisfying the requirement that the kidnapping result in the victim being physically injured or sexually abused. *See* La.R.S. 14:44.1(A)(3). Based on his delivering the victim into Bentley's hands, the evidence at least meets the requirement of being a principal to the kidnapping under La.R.S. 14:24, which states:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Although Defendant contends that Williams is not a credible witness, it is the fact finder's duty, not this court's, to weigh the credibility of witnesses. *Kennerson*, 695 So.2d 1367. Given the complete lack of evidence or testimony to contradict Williams' testimony, we cannot simply declare Williams to not be a credible witness. Accordingly, when viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found that the State proved its case beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

**SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES**

In his second assignment of error, Defendant argues that his Sixth Amendment right to confront and cross examine the witnesses against him was violated when the trial court allowed two witnesses, Cooper and Crystal, to testify regarding statements made by Bentley. Defendant further alleges that, under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), the wording of the Code of Evidence is irrelevant with regard to hearsay. We agree with the State, however, that the testimony complained of does not fall under the protections of *Crawford*, and that it does not violate Defendant's Sixth Amendment right.

Initially, we note that the *Crawford* portion of Defendant's claim lacks merit. While refraining from giving a comprehensive definition of "testimonial," the *Crawford* court noted that testimonial evidence is protected by the Sixth Amendment without regard for the hearsay rules of the States, but that the States are afforded "flexibility in their development of hearsay law" with regard to nontestimonial hearsay. 541 U.S. at 68. In *State v. Short*, 06-1451 (La.App. 3 Cir. 5/16/07), 958 So.2d 93, *writs denied*, 07-1473 (La. 2/1/08), 976 So.2d 714, and 07-1646 (La. 2/1/08), 976 So.2d 715, *cert. denied*, 555 U.S. 869, 129 S.Ct. 164 (2008), this court noted that statements from an unavailable co-defendant which do not attribute any conduct to the defendant on trial, and which were made to acquaintances, are nontestimonial under *Crawford*.

Much like in *Short*, the statements at issue in this case were made by Bentley, involve Bentley's conduct, intent, and criminal activity, and do not attribute any conduct to Defendant. The first challenged statement was Bentley telling Cooper that Cooper's girlfriend, the victim, was in trouble for stealing cocaine from Bentley. The other challenged statement was Bentley telling Crystal

that he, Bentley, was going to pay someone to hurt the victim. We find that these statements, made to acquaintances in a nontestimonial atmosphere, are not protected under *Crawford*, and, therefore, were admissible as statements against interest under the La.Code Evid. art. 804(B)(3) hearsay exception, which defines the "statement against interest" exception as:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The statement made by Bentley to Cooper was clearly against his interest, as he admitted to possession of cocaine. Additionally, Bentley's statement to Crystal that he was going to pay someone to hurt the victim was likewise a statement against Bentley's interest, as it tends to indicate criminal intent towards the victim. Although the relevancy of these statements is questionable, the State is correct in asserting that this assignment of error lacks merit, as neither admitted statement violates Defendant's Sixth Amendment right to confront and cross examine the witnesses against him, considering neither of the statements actually involve Defendant in any way.

## EXCESSIVE SENTENCE

In his third and final assignment of error, Defendant argues that his sentence of thirty years at hard labor, with the first two years to be served without benefits, is excessive. He argues, in part, that his sentence "is nothing more than the purposeless imposition of pain and suffering," given that his codefendant, Edwards, was allowed to plead guilty to simple kidnapping and received a five-

year sentence. As noted by the State, the details of Edwards' plea agreement are "not at issue in this case, and the reasons therefor are not part of the record." Defendant's thirty-year sentence is on the higher end of the five- to forty-year range established by La.R.S. 14:44.1.

Louisiana Code of Criminal Procedure Article 881.1 provides the mechanism for preserving the review of a sentence on appeal:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d

10

124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 96-6329, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In *State v. James*, 95-962 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, the defendant filed a motion to reconsider his sentence one year and eight months after sentencing, well beyond the thirty-day requirement provided by La.Code Crim.P. art. 881.1. The record of sentencing did not reflect that the trial court gave any additional time in which to file the motion. Therefore, this court found that, because the motion to reconsider sentence was not timely filed, the defendant's sentencing claims lacked merit. *See also State v. King*, 95-344 (La.App. 3 Cir. 10/4/95), 663 So.2d 307, *writ denied*, 95-2664 (La. 3/15/96), 669 So.2d 433.

11

In *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, the defendant failed to object to the sentence imposed at the sentencing hearing and did not timely file a motion to reconsider sentence. Thus, this court found his claim of excessiveness of sentence was barred. *See also State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59; *State v. Algere*, 09-85 (La.App. 3 Cir. 6/3/09) (unpublished opinion); *State v. Robinson*, 09-735 (La.App. 3 Cir. 12/9/09) (unpublished opinion); *State v. Stapleton*, 09-891 (La.App. 3 Cir. 2/3/10) (unpublished opinion); *State v. Gresham*, 10-474 (La.App. 3 Cir. 11/3/10) (unpublished opinion), *writ denied*, 10-2699 (La. 4/25/11), 62 So.3d 90.

Although Defendant made a contemporaneous objection to his sentence, he never filed a motion to reconsider the sentence as required by La.Code Crim.P. art. 881.1. In light of Defendant's failure to file the motion to reconsider sentence, we review Defendant's claim as a bare claim of excessiveness. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; and *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352.

Applying the *Lisotta* factors, we first look to the nature of the crime. Defendant was convicted of second degree kidnapping, a violent crime under La.R.S. 14:2(B)(16). Additionally, as noted repeatedly by the trial court during Defendant's sentencing, the victim of this kidnapping has never been seen or heard from since this incident.

Next, we examine Defendant's nature and background. Defendant was only twenty-four years old at the time of his sentencing, had previously attended college, had the strong support of his family, and whom the trial court noted "obviously had such potential." However, the trial court found that a number of aggravating factors in La.Code Crim.P. art. 894.1 were present, noting that Defendant helped orchestrate the capture of the victim and actively sought to turn her over to his brother, whom the trial court noted "injured and/or killed" her. The trial court also found that Defendant was "in need of correctional treatment or of a custodial environment that can be provided most effectively by your commitment to an institution. And any sentence lesser than that that I issue today would deprecate the seriousness of this offense." Additionally, the trial court noted that Defendant had a prior felony conviction for possession with the intent to distribute marijuana, making him a second felony offender.

Finally, we look at sentences imposed for similar crimes. Again, we note that Defendant's sentence of thirty years is an upper range sentence, as it represents seventy-five percent of the maximum allowable sentence.[4] This court, in *State v. Office*, 07-193 (La.App. 3 Cir. 10/3/07), 967 So.2d 1185, *writ denied*, 07-2274 (La. 4/18/08), 978 So.2d 348, affirmed a maximum sentence for second degree kidnapping wherein the defendant lured the victim into his own car under the pretense of wanting to purchase the car, subsequently stole the car, and fired a shot at the victim. In *Office*, after reviewing multiple cases in which Louisiana courts upheld maximum sentences for second degree kidnapping, this court noted that "it does not appear that the forty-year sentences are outside the norms of

___

[4]As noted by the trial court, the State could have filed habitual offender proceedings against Defendant, but did not. Defendant would likely have faced a life sentence, given his prior conviction for possession with intent to distribute marijuana. *See* La.R.S. 15:529.1.

13

Louisiana jurisprudence, even though maximum sentences are usually reserved for the worst offenders." *Id.* at 1194.

Unlike the victim in *Office*, who managed to escape relatively unscathed, the victim in this case has never been seen or heard from since the kidnapping for which Defendant was convicted. The trial court stressed this during sentencing, even noting the lack of closure and its impact on the victim's family. In light of *Office* and the cases cited therein, we cannot say that the trial court abused its discretion in sentencing Defendant. Accordingly, this assignment of error lacks merit.

**DECREE**

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED**.